No. 40,064

Louis H. Martin and Watson B. Joyes, *Appellants*, v. Roy M. Hunter, *Appellee*.

(297 P.'2d 153)

Opinion filed May 5, 1956.

*Riley W. MacGregor,* of Medicine Lodge, and *Robert Smith,* of Tulsa, Oklahoma, argued the cause, and *Vernon F. Coss,* and *John W. MacGregor,* both of Medicine Lodge, were with them on the briefs for the appellants.

*O. M. Wheat,* of Medicine Lodge, and *Carter Smith,* of Tulsa, Oklahoma, argued the cause, and were on the briefs for the appellee.

The opinion of the court was delivered by

WERTZ, J.: This was an action to expunge from the records in the office of the register of deeds an agreement placed of record by defendant, casting a cloud on plaintiffs' title in certain oil and gas leases and to quiet title to such interest in plaintiffs.

Appellants Louis H. Martin and Watson B. Joyes will be hereinafter referred to as plaintiffs, or separately as Martin and Joyes, and the appellee Roy M. Hunter as defendant or Hunter.

Plaintiff Martin was an aviation pilot and had been acquainted with Hunter about two years, and they acquired and developed oil and gas leasehold estates together.

Plaintiff Joyes was for many years a promoter in the drilling of leasehold estates for oil and gas. He had known Hunter for many years, but was not then acquainted with Martin.

Defendant Hunter was a petroleum engineer and had devoted

more than forty years to various phases of the oil and gas business and the development of oil and gas leases.

Some months prior to the institution of this action, Martin represented to Hunter that he had relatives and acquaintances in and around Hardtner in Barber county and, through such relationships, and acquaintance of his kindred with the landowners there, he could secure a block of acreage in that vicinity, provided a test well could be drilled somewhere on a block of acreage in approximately six months from the date of the proposed leases.

Martin secured for Hunter a Kansas blueprint oil and gas map from a Wichita map company, reflecting the landowners and the leases on the proposed block. Martin cross-marked with a pencil all the acreage he thought could be leased including two tracts of land, one of 160 acres and another of 80 acres belonging to Edd and Helena Sterling. After studying the map, Hunter went to the office of Joyes and exhibited the map to him, telling him of the acreage Martin thought he could secure, including the Sterling property. Joyes expressed a willingness to join in the enterprise, provided he could participate equally with Hunter and Martin. Hunter informed Martin of his conference with Joyes and urged that Joyes be taken in on the deal. Thereafter Hunter took Martin to see Joyes and they agreed to work together on the project. After working together for some time they entered into the following written agreement:

"This agreement made this . . . day of March, 1954, by and between Louis H. Martin, Roy M. Hunter and Watson B. Joyes, all of Tulsa, Okla. witnesseth:

"Whereas, Louis H. Martin, by virtue of his connection with the landowners in the vicinity of Hardtner, Barber County, Kansas, represents that he can secure a block of oil and gas leases covering some twenty five hundred acres, more or less, for the drilling of a well within a period of six months, and

"Whereas, Roy M. Hunter is able and willing to aid in the promotion of a well on said block and to make the necessary maps to use in said promotion, and,

"Whereas, Watson B. Joyes, by reason of his experience and contacts, can and will make the most advantageous drilling deal possible for the benefit of all concerned.

"It is hereby mutually agreed that Martin and Joyes will proceed to Hardtner as soon as possible and write up the oil and gas leases upon the most favorable terms possible. For the purpose of facilitating negotiations it is desirable that the leases be taken in the name of Watson B. Joyes, however, if this is not feasible they will be taken in Louis H. Martin's name and Martin agrees to assign to Joyes or his designate at such time as a deal is consummated.

"When leases are secured and in order, Joyes will proceed to use his best efforts to promote a test well on the block. Whatever monies, overriding royalties and or leases are cleared on the deal shall be divided between Martin, Hunter and Joyes, share and share alike.

"In order to simplify and expedite a deal, it is agreed that Joyes shall have full control of the block and the making of any deal upon such terms and conditions as he deems advisable.

"Actual out of pocket expense shall be shared equaly.

"Witness our hands this 22nd day of March, 1954.

"WATSON B. JOYES,
"ROY M. HUNTER,
"LOUIS H. MARTIN."

Subsequent to the signing of this agreement, Martin proceeded to block some 2,000 acres, some in his and some in the name of Joyes. The first lease was taken March 24, the Sterling leases on March 25, the Platt lease on April 3, and the Achenbach lease on April 8. The dates of other leases are not material here.

A portion of the block was assigned to the Aurora Gasoline Company who entered and drilled a producing gas well on the Rathgeber lease within the block in September, 1954.

In November, Martin made a division of the profits of the enterprise which he claimed at the trial was a full settlement. At the time, Hunter did not know whether Martin had conveyed the Sterling leases to get the well drilled, or sold the leases and contributed the money to the promotion of the Rathgeber well.

Hunter made a trip to Medicine Lodge, January 8, 1955, and discovered from the records in the office of the register of deeds that the Sterling leases were in the name of defendants Martin and Joyes, each owning an undivided one-half interest, with a well being drilled thereon at the time by Aurora Gasoline Company. Hunter contacted Joyes at Tulsa, Oklahoma, and demanded his interest in the leases, and Joyes advised him that he had been paid enough out of the deal. Hunter then made written demand on Martin and Joyes for his interest in the Sterling leases.

Hunter then filed the aforementioned written agreement between the parties of record in the office of the register of deeds of Barber county, after making a notation thereon that it was applicable to the Sterling leases. Martin and Joyes then filed the present action asking that the contract so recorded be stricken from the record and that title be quieted in them as plaintiffs.

Hunter filed a cross-petition asserting that by reason of the contract with the plaintiffs the relationship of joint adventurers existed,

and that by reason of the fiduciary relationship he was entitled to his undivided one-third interest in the Sterling leases.

The case was tried by the court on a partial stipulation of facts, and the evidence presented by the respective parties. The court made the following findings of fact:

". . . that during the latter part of 1953 or the early part of 1954 the Plaintiff, Louis H. Martin, was an airplane pilot of Tulsa, Oklahoma; that he approached the Defendant, Roy M. Hunter, and advised Defendant that he was related to and had the acquaintance of several large landowners in the vicinity of Hardtner, Kansas, and that he believed he could get up a drilling block of leases in said vicinity; that an oil and gas map of Barber County was procured and after one or more conferences concerning the acquisition of a block of leases in said vicinity the Plaintiff, Martin, and the Defendant, Hunter, solicited the Plaintiff, Watson B. Joyes, to join them in an adventure. Thereafter Plaintiffs and Defendants made and entered into the contract in writing as set forth in plaintiffs' petition and Defendant's cross-petition. Immediately thereafter the said Plaintiffs, Martin and Joyes proceeded to Hardtner, Kansas, and commenced leasing operations. For several days thereafter said parties were acquiring leases pursuant to the written contract and on March 25, 1954, the Plaintiff, Martin, acquired from Edd L. Sterling and wife two oil and gas leases on land hereinafter described. Both of these tracts were in close proximity to the other lands being leased. Martin paid Sterling one dollar per acre for said leases which was necessary in order to obtain the same, as was the case upon certain of the Achenbach land. The court further finds that during said leasing operations the parties acquired leases upon approximately 2500 acres, including the Sterling leases. Thereafter the Plaintiff, Watson B. Joyes, negotiated a drilling contract with a drilling company whereby the Plaintiffs assigned most of the leases, retaining certain interests therein, to the drilling company and obtained a producing well upon the block of leases assigned. The Sterling leases, however, were not assigned to the drilling company and some time after production was obtained on the block of leases assigned the Plaintiff, Martin, assigned a one-half interest in the Sterling leases to his co-plaintiff, Watson B. Joyes. That the Plaintiffs accounted to the Defendant for all of the leases taken and sold, except the Sterling leases, and concerning which the Defendant, Hunter, was not advised until in January, 1955. Immediately thereafter and on January 20, 1955, Defendant, Hunter, caused the contract between the Plaintiffs and the defendant to be acknowledged as to himself and procured the recordation of said contract in the office of the register of deeds of Barber County, Kansas, together with a reference thereon to the two tracts of land covered by the Sterling leases. The court finds that the belated acknowledgment by the Defendant did not cause said instrument to become eligible to record and that the same should be stricken therefrom. The court further finds that the Plaintiffs and the Defendant became joint venturers and that by reason of said relationship each of said parties assumed fiduciary relationship to each of the others and each was entitled to an equal part of benefits and accumulation from said joint venture . . ."

The court concluded as a matter of law that the contract, dated March 22, 1954, between the parties and recorded in the office of the register of deeds, be canceled of record, and further ordered that upon Hunter paying the plaintiffs, or tendering into court for their benefit, one-third of the cost of the Sterling leases together with one third of the delay rentals paid thereunder, Hunter would become an equal and co-owner of the Sterling leases with plaintiffs. Plaintiffs were directed to convey to Hunter his one-third interest therein as more fully set out in the judgment entered. From an order overruling plaintiffs' motion for a new trial, they appeal.

Plaintiffs' abstract contained seven specifications of error. However, after an examination of their brief, they may be summarized as (1) the decision of the court was contrary to the evidence; (2) the trial court erred in holding the joint venture or partnership covered the Sterling leases, and (3) in entering judgment allowing Hunter a one-third interest in the Sterling leases subject to the drilling contracts made by the plaintiffs.

Plaintiffs first contend that the transactions with respect to the two Sterling leases were individual transactions of Martin, in which Hunter had no interest or claim. It is asserted that these dealings by Martin were no part of the original joint adventure, but were personal dealings not associated therewith, and that the Sterling leases formed no part of the block of acreage secured under the agreement between the parties.

Defendant Hunter contends that the Sterling leases were a part of the joint adventure, and that the map presented by Martin to him for consideration was to be presented to Joyes in an attempt to get a drilling contract for a well some place in the block, and that Martin had plainly marked thereon the two Sterling leases as a part of the block which might be obtained.

The evidence was highly conflicting, each party offering proof to sustain the respective contentions. The court by its findings concluded the Sterling leases were a part of the joint adventure, and included in the acreage to be obtained by Martin for the benefit of all parties. Both Hunter and his son testified that when Martin brought the map from the Kansas Blueprint Company, the Sterling leases were plainly marked, along with other land in the block, open for leasing. It was stipulated that Martin took the first leases in the block on March 24, 1954; the Sterling leases on March 25, the Platt lease on April 3, and the Achenbach on April 8; that the

leases, except Sterling's, were put in the block and accounted for by Martin; that the gas well on the block was brought in as a producer in September, 1954. The evidence disclosed that subsequent thereto, Martin assigned a half interest in the Sterling leases to Joyes, and a well was brought in on the Sterling leases in January, 1955. Hunter checked the records and found for the first time that the Sterling leases were being held by Martin and Joyes and no accounting had been made to him on these leases.

No useful purpose could be gained by narrating all the controversial evidence contained in the record. Suffice it to say that the mentioned facts were sustained by ample, competent evidence, and the court did not err in holding that the Sterling leases were part of the block of acreage obtained in the joint adventure of the parties.

This is essentially a fact case. Plaintiffs, in effect, ask this court to retry their lawsuit. We cannot do so.

It has been a well-established rule in this state for more than ninety years that this court accepts as true the trial court's findings of fact when they are based upon competent evidence; and on appeal it is of no consequence that there may have been much contradictory evidence adduced at the trial, which, if believed by the trial court, would have compelled entirely different findings of fact and an entirely different judgment, and when the error assigned is that the findings and judgment are contrary to the evidence, it is only necessary on appeal to consider whether there is some competent and sufficient evidence upon which the judgment is based; and a consideration or recital of the contradictory evidence cannot aid in correctly determining that question. (*Bayer v. Cockerill*, 3 Kan. 282; *Bruington v. Wagoner*, 100 Kan. 439, 164 Pac. 1057.) In *Stanley v. Stanley*, 131 Kan. 71, 289 Pac. 406, we said:

"Rule followed that where a general finding and judgment of the trial court is supported by substantial testimony the supreme court cannot undertake to make an independent determination of the question whether the preponderance of evidence inclined on the side of the prevailing party or on the side of his adversary." (Syl. ¶ 2)

In *Jones v. Jones*, 161 Kan. 284, 296, 167 P. 2d 634, it is stated:

". . . It is well established that the trial court, not this court, has the duty of determining whether the evidence is clear and convincing, and that on appeal it is of no consequence there was much contradictory evidence offered, which, if believed, would have compelled entirely different findings of fact and an entirely different judgment . . ."

See, also, *Gilpin v. Burch*, 145 Kan. 224, 231, 65 P. 2d 308; *Tucker*

*v. Hankey,* 173 Kan. 593, 250 P. 2d 784; *In re Estate of Beeler,* 175 Kan. 190, 194, 262 P. 2d 939; *Rupp v. Rupp,* 171 Kan. 357, 233 P. 2d 709.

Under the record in this case it was established that the relationship of joint adventurers existed between plaintiffs and defendant and, as such, they stood in a close relationship of trust and confidence, and were bound by the same standards of good conduct and square dealing as are required by partners. Each of the parties had the right to demand and expect from his associate full, fair, open and honest disclosure of everything affecting the relationship. Under such conditions, Martin could not act in such a manner that his personal interest was hostile to that of Hunter.

One of the leading cases on the law pertaining to joint adventurers is *Meinhard v. Salmon,* 249 N. Y. 458, 463, 164 N. E. 545, wherein Chief Judge Cardozo, speaking for the New York Court, said:

"Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'distintegrating erosion' of particular exceptions (*Wendt v. Fischer,* 243 N. Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

In *Potucek v. Blair,* 176 Kan. 263, 270 P. 2d 240, and cases therein cited, we held that the relationship of joint adventurers is a fiduciary one based on mutual confidence and trust.

Under the contract between the parties in the instant case, it was the duty of Martin and Joyes to write the oil and gas leases in the block upon the most favorable terms possible and, for the purposes of facilitating negotiations, the leases should have been taken in the names of Joyes or Martin and, when the leases were secured, Joyes was to proceed to use his best efforts to promote a test well on the block, and whatever monies, overriding royalties, and or leases which might be cleared on the deal should have been divided between Martin, Hunter and Joyes, share and share alike. Martin and Joyes accounted to Hunter for all the leases except the Sterlings.

These they withheld for their own personal interests, even though taken at the identical time other leases were taken under the joint adventure. The general rule is that until the joint adventure has terminated or the enterprise has been abandoned, a joint adventurer cannot exclude his associates from an interest in the property by purchasing it for his individual account; neither can he acquire for his individual benefit, or for the benefit of himself and one of the other co-adventurers, an interest therein antagonistic to the interest of his co-associates, and if he does so purchase or acquire such interest in breach of his duty to his co-adventurers, he must account to them therefor. (*Kincaid v. Miller*, 129 Colo. 552, 272 P. 2d 276; *Crawford v. Crawford*, 163 Kan. 126, 181 P. 2d 526.)

Plaintiffs contend the court erred in refusing to permit, on rebuttal, the introduction of a blueprint map dated May, 1954, reflecting the fact that the Sterling property was still under an oil and gas lease. The court properly rejected this evidence as it was stipulated between the parties that the Sterling property had been under a lease to Mr. Coppinger but these leases were released of record on February 26, 1952. Moreover, the record disclosed Martin had secured a lease on the Sterling property March 25, 1954.

After a careful review of the entire record, we must conclude, as the trial court, that Martin and Joyes having acquired the Sterling leases, continued to own them or at least had an equitable interest in them, until they were divided equally between them and their co-adventurer Hunter, and the court rightfully ordered plaintiffs to convey to Hunter his undivided one-third interest as set forth in the judgment below. We find nothing in plaintiffs' brief which would justify a reversal of the judgment rendered by the trial court.

The judgment is affirmed.