Robert E. RANKIN, Petitioner,

v.

J. M. NAFTALIS et al., Respondents.

No. B–6447.

Supreme Court of Texas.

Oct. 5, 1977.

Rehearing Denied Nov. 16, 1977.

Jennings, Montgomery, Dies & Turner, Frank L. Jennings, Graham, for petitioner.

Fillmore & Camp, John P. Camp, Fort Worth, for respondents.

POPE, Justice.

Dr. J. M. Naftalis, Dr. R. D. Martin, Gene S. Friedman, and E. F. Lisle filed suit against Robert E. Rankin seeking to impress a constructive trust upon an oil and gas lease that he took in his name. The defendant, Rankin, pleaded in defense, that plaintiffs' claim was barred by the Statute of Frauds, the Statute of Conveyances, and the Texas Trust Act. Rankin also defended on the grounds that plaintiffs were estopped to assert their claim in equity. After a jury trial, the court rendered judgment that the plaintiffs take nothing, but the court of civil appeals with one justice dissenting, reversed the judgment. 542 S.W.2d 893. We reverse the judgment of

the court of civil appeals and affirm the trial court's judgment that plaintiffs take nothing.

The defendant, Rankin, in March, 1973, acquired what is called the Melton oil and gas lease to a quarter section of land in Knox County. He needed funds to develop the lease, so he contacted and explained to each of the plaintiffs the prospects for a well on the lease. Naftalis and the other plaintiffs had their own attorney prepare contracts so each of the plaintiffs could separately contract with the defendant, Rankin. Each contract obligated Rankin to assign to each of the plaintiffs a fractional interest in the Melton lease and required each assignee to pay a stated sum into an escrow account at a bank in Dallas. The funds were to be paid and were paid to Rankin when he drilled the well on the Melton lease to a depth of one thousand nine hundred fifty feet. The assignments in the working interest of the Melton lease were: one-sixth to Dr. Naftalis, one-sixth to Dr. Martin, one-sixth to Gene Friedman, and one-fourth to Lisle. Rankin retained the remaining one-fourth interest.

Each contract designated Rankin as the drilling contractor and gave Rankin control of the drilling, development, operations, marketing, accounting, and the execution of division orders. The contracts provided that upon completion of a commercial well, the assignees would pay Rankin an additional pro rata part of eight thousand dollars to complete the well, and Rankin agreed to pay any additional costs. The contracts described the Melton lease and dealt with that lease only.

In May, 1974, the first well on the Melton lease was completed as a producer, though not a good one. After the first well was drilled, Rankin told one or more of the plaintiffs that he would obtain the Orsak lease for all of the same parties. A second well was also drilled on the Melton lease in May. The parties shared their proportionate costs for operating and equipping that well, but disputes arose concerning the expenses and the use of the first Melton well as early as July, 1974. Up to the early part of 1975, the parties held meetings and paid the bills arising out of the operation of the Melton lease from a bank account, called the "Melton Lease Account." Each party had authority to write checks to pay the expenses. The income from the well was paid directly to each of the parties according to their ownership in the lease. The plaintiffs testified that Rankin told them, even after he had obtained the Orsak lease in his own name, that he had not been able to obtain it.

On August 21, 1974, defendant Rankin purchased the William Orsak lease with his own funds, and he filed the lease for record on October 4, 1974. The claim to the constructive trust is that Rankin, before the Melton lease agreements were executed, and while the Melton wells were being drilled, told one or more of the plaintiffs that he was trying to acquire the Orsak lease and that he would take the lease in the names of all the participants in the Melton lease. There was no discussion about the amount that the plaintiffs would contribute to the drilling or completion of a well on the Orsak lease. That lease would have to be drilled to a different horizon and into a different sand from the Melton lease.

On April 24, 1975, defendant Rankin began drilling operations on the Orsak lease. Naftalis and the other plaintiffs learned about the activity and consulted an attorney two days later. They did not at that time, however, assert any claim in the Orsak lease. On May 20, 1975, Naftalis and the other plaintiffs filed a suit for the partition of the Melton lease, but they still made no claim to the Orsak lease. In their suit concerning the Melton lease, they also asked for damages, so the trial court on June 27, 1975, severed the partition and the damage actions into separate causes. The District Court of Knox County appointed a receiver with orders to sell the Melton lease at a public sale, and on July 1, 1975, Naftalis and the other assignees bought the Mel-

ton lease at the public sale. The damage or accounting suit was pending at the time the present action was tried.

During the early part of May, 1975, Rankin successfully completed the Orsak well as a producer. It was after the well was completed and after Naftalis and the plaintiffs learned from investigating the records of the Railroad Commission that it was a producing well, that they filed this action on July 14, 1975, and for the first time asserted a constructive trust in three-fourths of the Orsak lease and well.

Naftalis and the other plaintiffs rely upon the jury answers to three special issues as a basis for judgment; defendants rely upon a number of other issues to support the judgment that plaintiffs take nothing. The findings which plaintiffs believe support a judgment for their claim to a constructive trust are that (1) during August, 1974, the plaintiffs and defendant were jointly engaged in the business of operating the Melton lease, sharing income and expenses according to their ownership interests; (3) between the time drilling commenced on the Melton lease and August 21, 1974, Robert Rankin represented to . . . the plaintiffs that he would obtain the Orsak lease for himself and the plaintiffs; and (7) the defendant Rankin failed to inform Tooker Lisle (a plaintiff) before August 21, 1974, of his intention to acquire the Orsak lease.

Defendant Rankin relies upon the jury's refusal to find that (4) the relationship of the parties on August 21, 1974, justified plaintiffs in believing that defendant Rankin would act in the mutual interest of the plaintiffs and the defendant; (5) defendant Rankin in acquiring the Orsak lease for himself amounted to an abuse of the relationship; (6) defendant's failure to inform the plaintiffs before August 21, 1974, of his intention to acquire the Orsak lease for himself amounted to an abuse of the relationship inquired about in (4) above. Defendant Rankin also relies upon the jury's findings on the estoppel issues that (13)

plaintiffs knew that defendant Rankin had obtained the Orsak lease for himself prior to his commencement of drilling operations on that lease; (14) the plaintiffs remained silent until after Rankin had completed a producing well on the lease; (15) Rankin relied upon plaintiffs' silence in conducting the drilling operations; and (16) but for Rankin's reliance upon plaintiffs' silence, he would not have conducted the drilling operations.

We need to narrow the issues in this case. This is not a case in which the plaintiffs have charged the defendant with actual fraud. *Meadows v. Bierschwale*, 516 S.W.2d 125, 129 (Tex.1974). The case is not one in which the alleged trust concerned or the trustee reacquired the original property that was covered by a confidential arrangement as was the case in *Omohundro v. Matthews*, 161 Tex. 367, 341 S.W.2d 401 (1960); *Mills v. Gray*, 147 Tex. 33, 210 S.W.2d 985 (1948); *MacDonald v. Follett*, 142 Tex. 616, 180 S.W.2d 334 (1944), and *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928). It is not a case in which the original contract embraced the general business for the continued acquisition of mineral lands as was the case of *Huffington v. Upchurch*, 532 S.W.2d 576 (Tex.1976). The jury found that Rankin did not acquire the Orsak lease upon the basis of information he received in drilling the Melton lease. *Smith v. Bolin*, 153 Tex. 486, 271 S.W.2d 93 (1954). The parties reduced their contract to writing and limited the venture to the described Melton lease. The plaintiffs still rely upon the contracts by their independent suit, and they must show in this case that the written contracts actually extended to and reached properties that the contracts excluded.

▐ The Texas Legislature on successive occasions from the early days of the Republic has expressed its intent that contracts concerning lands must not, as Lord Coke expressed it, "be left to slippery memory" but must be reduced to writing. The purposes served by and the reasons for the

Statute of Frauds, Tex.Rev.Civ.Stat.Ann. art. 3995, and the Texas Trust Act, Tex. Rev.Civ.Stat.Ann. art. 7425b–7, are reiterated in *Consolidated Gas & Equipment Co. v. Thompson,* 405 S.W.2d 333 (Tex.1966), and earlier by *Pope v. Garrett,* 147 Tex. 18, 211 S.W.2d 559, 562 (1948). In 1840, the Texas Congress adopted the Statute of Frauds,[1] and the Statute of Conveyances.[2] Before 1943, the law allowed some margin in the enforcement of express oral trusts;[3] but in 1943 the Texas Trust Act terminated that liberality by the enactment of article 7425b–7.[4] In 1945, the legislature redefined a trust in such a way as to exclude resulting or constructive trusts from the prohibitions of the Trust Act. Tex.Rev.Civ.Stat.Ann. art. 7425b–2.

A constructive trust escapes the unquestioned general rule that land titles must not rest in parol, but to do so, there must be strict proof of a prior confidential relationship and unfair conduct or unjust enrichment on the part of the wrongdoer. *Tyra v. Woodson,* 495 S.W.2d 211 (Tex. 1973); *Consolidated Gas & Equipment Co. v. Thompson,* 405 S.W.2d 333 (Tex.1966). "It must be used with caution, especially where as here proof of the wrongful act rests in parol, in order that it may not defeat the purposes of the statute of wills, the statute of descent and distribution, or the statute of frauds." *Pope v. Garrett,* 147 Tex. 18, 211 S.W.2d 559, 562 (1948). Sub-

jective trust, cordiality and the trust which prevails between businessmen which is the foundation of ordinary contract law, affords no basis for the imposition of an oral trust that thwarts the Statute of Frauds. *Thigpen v. Locke,* 363 S.W.2d 247 (Tex. 1963).

The scope of a prior confidential relationship is broader when the defendant is a fiduciary such as an executor, administrator, guardian, attorney or partner. *Thigpen v. Locke, supra; Johnson v. Peckham,* 132 Tex. 148, 120 S.W.2d 786 (1938); Bogert, Trusts & Trustees § 481 (2d ed. 1960). While we recognize that the relationship between the parties in the Melton lease was fiduciary in character, the fiduciary duties extended only to dealings within the scope of the underlying relationship of the parties: joint venturers for the development of a particular oil and gas lease. Their fiduciary duties arose from the relationship of joint ownership of the mineral rights of a particular mineral lease. Their joint enterprise extended to paying the production costs of the wells on the Melton lease and sharing the benefits derived proportionately. Had the alleged impropriety been within the scope of these activities, as by one party's appropriating the operating expense account to purchase land in his own name, a breach of the fiduciary relationship would have occurred and the resulting or constructive trust remedy would be imposed. Such was not the case here.

---

1. Article 3995. Writing required

   No action shall be brought in any court in any of the following cases, unless the promise or agreement upon which such action shall be brought, or some memorandum thereof, shall be in writing and signed by the party to be charged therewith or by some person by him thereunto lawfully authorized:

   \* \* \* \* \* \*

   4. Upon any contract for the sale of real estate or the lease thereof for a longer term than one year; or,

2. Article 1288. Instrument of conveyance

   No estate of inheritance or freehold, or for a term of more than one year, in lands and tenements, shall be conveyed from one to another, unless the conveyance be declared by an instrument in writing, subscribed and

delivered by the party disposing of the same, or by his agent thereunto authorized by writing.

3. See Fritz, *The Texas Law of Conveyancing,* 3 Vernon's Texas Civil Statutes 3, 8 (1962).

4. Provided, however, that a trust in relation to or consisting of real property shall be invalid, unless created, established, or declared:

   1. By a written instrument subscribed by the trustor or by his agent thereunto duly authorized by writing;

   2. By any other instrument under which the trustee claims the estate affected. Tex. Rev.Civ.Stat.Ann. art. 7425b–7.

In a prior case in which it was argued, as it is here, that the scope of a joint venture to produce gas from particular leases extended beyond the particular land of the leases, the court has said:

The parties did not undertake to engage generally in the production and sale of gas from the Lopena field. The extent of their enterprise or joint venture was carefully defined by the contract. It contemplated and provided for the development of certain specified and carefully described areas held under certain named and well identified leases. . . . The subject matter of the enterprise, the property employed in the joint adventure, was those leases, the land described in them, and the gas under the land. *Warner v. Winn*, 145 Tex. 302, 197 S.W.2d 338, 342 (1946).

■ It is true that in *Warner* the contracts expressly provided that they were the full and complete agreement of the parties. We do not regard that distinction as significant. What is significant is the underlying relationship of the parties as limited joint venturers.[5] The scope of the fiduciary duties raised by such a relationship does not extend past the development of the particular lease and activities incident to that development. "The mere existence of a . . . joint venture of concurrent ownership does not, however, require one party to share the benefits of his own enterprise with another. It must also appear that the interest acquired was within the scope of the fiduciary duty." Williams & Meyers, Oil and Gas Law § 442.1 (1975). As the Supreme Court of Kansas has said in an analogous situation, "The fiduciary relationship created by a joint drilling venture does not forbid further acquisition and development of leases in the general area by individual venturers so long as these leases are not embraced within the scope of the enterprise or are not a natural outgrowth therefrom." *Foley v. Phillips*, 211 Kan. 735, 740, 508 P.2d 975, 979 (1973). To hold otherwise would restrict the financing scheme of future oil and gas leases to the same terms as on an existing lease because one of the drilling venturers in the first lease also participated in the drilling venture of the second lease. Such a holding would discourage the financing of new oil and gas leases. To extend the writings of the parties beyond the land specified in the writing would frustrate the policies of the Statute of Frauds and the Texas Trust Act.

■ The same policy of respect for the limited scope of the enterprise precludes the plaintiffs from recovering on the ground that theirs was a broader partnership arrangement. Plaintiffs assert a partnership but they have proved no more than the kind of arrangement which the legislature had in mind by its enactment of Tex. Rev.Civ.Stat.Ann. art. 6132b, § 7:

Sec. 7. In determining whether a partnership exists, these rules shall apply:

\* \* \* \* \* \*

(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.

(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.

\* \* \* \* \* \*

(5) Operation of a mineral property under a joint operating agreement does not of itself establish a partnership.

---

**5.** Close friendly or familial relationships have occasionally formed the evidentiary basis for jury findings that in fact a special confidential relationship existed which was abused. *See Holland v. Lesesne*, 350 S.W.2d 859 (Tex.Civ. App.—San Antonio 1961, writ ref'd n.r.e.). The abuse of this special type of confidential relationship is akin to fraud and undue influence, and we do not find the issue raised by either the plaintiffs' pleading or evidence. At any rate, recovery on such ground is precluded by the jury's specific refusal to find that an abuse of the relationship occurred.

Subdivision 5 of section 7, *supra*, embodies what this court had already expressed in *Warner v. Winn, supra,* and *MacDonald v. Follett,* 142 Tex. 616, 180 S.W.2d 334, 337 (1944). Evidence of a joint operating arrangement to develop a particular lease will not support a finding of a broader relationship. It is common practice to conduct mineral development under a joint operating agreement, and while there are duties between the parties for the operations of the lands embraced by the written agreement, those duties do not extend to operations by one of the parties on other and different lands.[6] The Orsak lease is outside of the operating agreement. For that reason, the conduct complained of was outside the scope of the fiduciary duties that were established.

The claim to a constructive trust in this case is similar to that asserted in *Smith v. Bolin,* 153 Tex. 486, 271 S.W.2d 93 (1954). Unlike the present case, in *Bolin* there was a written partnership agreement between the parties, with Bolin named the managing partner. The partnership took leases on certain properties, including several that were known as the Howard leases. When Bolin took new leases of the partnership's Howard leases, this court ruled that there was a fiduciary duty which Bolin owed his partners. This court held further, however, that Bolin owed his partners no fiduciary duty to include them in "farmout" agreements he made with Standard Oil and Reno Oil as to two other leases, because they were not embraced in the written contract. The court of civil appeals had held with respect to those leases which were outside the original contractual agreement: "The fiduciary duties they owed one another would be no broader than the activities encompassed by their agreements relating thereto." *Smith v. Bolin,* 261 S.W.2d 352,

370 (Tex.Civ.App.1953). This court reversed the judgment which denied a constructive trust as to the mineral properties which were a part of the written contract; it affirmed the denial of a constructive trust as to the properties which were not described in the contract between the parties.

The judgment of the court of civil appeals is reversed, and the judgment of the trial court is affirmed.

## ON MOTION FOR REHEARING

Respondents complain of a sentence in the court's opinion which states that the Orsak lease had to be drilled into a different sand from that of the Melton lease. There was contradictory testimony concerning that fact. In any event, the jury refused to find that the Orsak lease was acquired solely by reason of information obtained from drilling the Melton wells.

The motion for rehearing is overruled.

---

**6.** Professor Bromberg makes this comment about subsection (5) of section 7, article 6132b:

> Paragraph (5) has been added to make it clear that a joint operating agreement does not alone create a partnership. Parties to such an agreement are normally co-owners of property designating a single agent to act for them. Ordinarily they do not intend and should not be compelled to bear each other's liabilities. Similar results have been reached

on other theories in some "mining partnership" cases, but the specific mention of joint operating agreements is more precise and understandable. The provision does not, of course, prevent partners from operating oil properties or joint operators from becoming partners if they so desire. Bromberg, *Source and Comments on Section Seven,* 17 Vernon's Texas Civil Statutes 311 (1970).