**OLD COLONY VENTURES I, INC., Plaintiff,**

v.

**SMWNPF HOLDINGS, INC., et al., Defendants.**

No. 95–2050.

United States District Court, D. Kansas.

Feb. 26, 1996.

Gregory L. Musil, Steven D. Ruse, Shughart, Thomson & Kilroy, Overland Park, KS, P. John Brady, James C. Sullivan, Shughart, Thomson & Kilroy, Kansas City, MO, for Old Colony Ventures I, Inc.

Robert P. Wray, Roy R. Darke, Jerald S. Meyer, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, Renana B. Abrams,

Armstrong, Teasdale, Schlafly & Davis, Olathe, KS, for SMWNPF Holdings, Inc.

Roy R. Darke, Jerald S. Meyer, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, Renana B. Abrams, Armstrong, Teasdale, Schlafly & Davis, Otathe, KS, for Sheet Metal Workers National Pension Fund, Arthur Moore, Alan J. Chermack, Ronald Palmerick, Matthew B. Hernandez, Bruce J. Stockwell, Robert Custer, Robert T. Stringer, Carl Moore, Robert J. Fanning.

Gordon D. Gee, Laurilyn A. Goettsch, Seigfreid, Bingham, Levy, Selzer & Gee, Kansas City, MO, for Merrill Lynch Pierce Fenner & Smith, Inc.

Roy R. Darke, Jerald S. Meyer, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, John E. Ivan, Shawnee Mission, KS, Jennifer L. Lewis, John Ivan Law Office, Shawnee Mission, KS, for Robert B. Francis, Clinton O. Gowan, Jr.

Steven D. Ruse, Shughart, Thomson & Kilroy, Overland Park, KS, P. John Brady, James C. Sullivan, Shughart, Thomson & Kilroy, Kansas City, MO, for Rist Group, Inc.

John E. Ivan, Shawnee Mission, KS, Jennifer L. Lewis, John Ivan Law Office, Shawnee Mission, KS, for Woodland Hills Joint Venture.

James C. Wirken, Michael S. Jones, The Wirken Group, P.C., Kansas City, MO, for Holland Corp.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Old Colony Ventures I, Inc. (OCV) alleges in this action, among other things, that SMWNPF Holdings, Inc. (Holdings) prevented a real estate development project from being completed. Holdings has asserted several cross claims against Woodland Hills Joint Venture (WHJV), a general partnership consisting of OCV and Holdings. Presently before the court is Holdings's motion for partial summary judgment on counts VI

and VII of its cross claims and for severance thereof (Doc. # 153).[1] Influenced heavily by the totality of the circumstances surrounding the particular trilateral relationship among OCV, Holdings and WHJV, the court makes the following rulings: (1) material questions of fact exist regarding whether a default has occurred and (2) the issues implicated by counts VI and VII are inextricably intertwined with the remainder of the case. As a result, Holdings's motion is denied.

### I. Facts [2]

WHJV is a Kansas general partnership with two general partners: OCV, an Illinois corporation with its principal place of business in Kansas and Holdings, a Delaware corporation with its principal place of business in Virginia. WHJV arose from a February 20, 1992 agreement between OCV and Holdings entitled "Venture Agreement of the Woodland Hills Joint Venture, a Kansas joint venture" (joint venture agreement). Pursuant to the joint venture agreement, Holdings loaned WHJV $9,000,000 on March 20, 1992. In exchange for the loan, WHJV executed a promissory note (note) in favor of Holdings with a principal amount of $9,000,000. WHJV and Holdings also entered into a Loan and Security Agreement (loan agreement), which outlined the lending relationship between WHJV and Holdings. The loan was secured by a mortgage, in favor of Holdings, on real property owned by WHJV. As additional security, OCV executed, in favor of Holdings, an assignment and security agreement (assignment agreement) of OCV's partnership interest in WHJV. On April 8, 1993, WHJV and Holdings agreed to increase the principal loan amount to $9,500,000.

Pursuant to the loan documents, WHJV submitted 15 draw requests to Holdings between February of 1992 and July of 1993. Holdings paid the requests, which together totaled $9,500,000. Of the amount requested, WHJV used $627,880 to pay Holdings for interest on the note.

---

1. On September 26, 1995, the court ruled that WHJV need not make any additional filings because its position could be asserted by the joint venturers. Consistent with that ruling, OCV has filed the response to Holdings's motion.

2. The following facts are either uncontroverted or stated in the light most favorable to WHJV for the purpose of resolving this motion.

WHJV has made no payment on the note since May 5, 1994 [3]—neither an interest payment nor full payment when the note became due on April 1, 1995. Each loan document contains provisions defining default. Holdings contends that, under these provisions, WHJV defaulted on its obligations. WHJV responds that the conduct of Holdings, which is both the lender to whom the debt is owed and an equal partner in the partnership which is the borrower, bars application of the default provisions and provides a defense to foreclosure.

## II. Standard for Summary Judgment

When considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party. *Jones v. Unisys Corp.*, 54 F.3d 624, 628 (10th Cir.1995). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533 (10th Cir.1995). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Union Pacific R.R.*, 740 F.Supp. 1519, 1522–23 (D.Kan. 1990). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555.

## III. Discussion

Holdings seeks summary judgment on the basis that WHJV defaulted on the loan and waived any defenses it might have to foreclosure. In the alternative, Holdings requests severance of its foreclosure cross claims from the remainder of the action.[4] Because the court concludes that material fact questions exist regarding whether or not a default occurred, summary judgment may not be granted. The court also finds that, under the circumstances presented by this action, severance would be inappropriate.

### A. Default

Holdings maintains that WHJV defaulted on the loan by failing to make required interest payments and/or by failing to pay the note when it became due. WHJV responds that the loan agreement obligated Holdings to make the interest payments until the project generated a cash flow. WHJV also

---

3. WHJV attempted to deny this factual statement on the basis that it was without sufficient information to form a belief as to the truth of the statements. Such a basis is insufficient under D.Kan. R. 56.1, which requires the party to refer with particularity to those portions of the record upon which the party relies. The factual statement is therefore deemed admitted.

4. Both parties presume that Kansas law determines whether or not default and waiver have occurred. The court agrees. The loan agreement contains a choice of law provision declaring that Kansas law shall govern all the loan documents. The court is bound to apply the forum state's rule as to whether a contractual choice of law provision is enforceable. *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1360 (10th Cir.1990). Kansas courts have in the past permitted choice of law provisions to control and the court sees no reason why Kansas would not give effect to the provision of the loan agreement under the circumstances of this case. *See id.* (applied Kansas law as agreed to by the parties in their contract); *O.V. Marketing Assoc., Inc. v. Carter*, 766 F.Supp. 960, 964 (D.Kan.1991); *c.f. National Equip. Rental, Ltd. v. Taylor*, 225 Kan. 58, 60, 587 P.2d 870, 872 (Kan.1978) (holding that Kansas recognizes parties' agreement for the law of another state to govern their rights and duties so long as the transaction at issue has "a reasonable relation" to that state).

Whether or not severance is appropriate under Federal Rule of Civil Procedure 21 is, of course, governed by federal law.

claims that Holdings's inequitable conduct caused any failure of WHJV to meet its obligations. The court agrees with WHJV's latter contention.

Both parties cite to portions of the following language from the loan agreement as controlling the duty to make interest payments:

2.02 *Maximum Loan Amount.* The aggregate amount of funds advanced to borrower at any one time under the Loan shall not exceed [$9,500,000] in any event. If at any time the aggregate unpaid principal balance outstanding under the Loan exceeds the foregoing maximum amount, Borrower shall immediately pay Lender the amount by which the outstanding principal balance of the loan exceeds [$9,500,000].

2.03 *Purposes of Advances.* Lender may advance funds from time to time in its sole and absolute discretion under the Loan, at Borrower's request, to pay or to reimburse Borrower for the payment of (i) the cost of Borrower's acquisition of the Land, (ii) sums owed by Borrower to Lender in reimbursement of due diligence costs incurred by Lender in preparing for the execution of the Venture Agreement and/or in preparation for the making of the Loan, (iii) Construction costs incurred in connection with the development or subdivision of the Land, the construction of improvements and/or the development, design, construction, management, marketing or completion of the Project and (iv) interest payable from time to time on the outstanding balance of the Loan in accordance with the terms of the Note, and for no other purpose without Lender's prior written consent, which may be granted or withheld in each instance in Lender's sole and absolute discretion.

\* \* \* \* \* \*

Lender agrees to advance the monthly payments of accrued interest required under the Note until such time as funds are available from operation of the Project to pay such interest payments.

The parties disagree about the meaning of the last paragraph of section 2.03. WHJV contends that this paragraph obligates Holdings to advance interest payments until the project generates funds or, if the project fails to generate funds, for the duration of the loan. According to WHJV, the obligation to advance interest payments exists irrespective of other provisions in the loan agreement. Not surprisingly, Holdings disagrees with WHJV's analysis. Holdings points to section 2.02 as authority for its position that it has no obligation to make advances once the loan limit is reached, which occurred by July of 1993.[5] The court agrees with Holdings.

The construction and effect of contracts "is a question of law to be determined by the court." *First Hays Banshares, Inc. v. Kansas Bankers Sur. Co.,* 244 Kan. 576, 586, 769 P.2d 1184, 1191 (1989). Whether or not the language of a contract is ambiguous is a question of law for the court to resolve. *Carland v. Metropolitan Life Ins. Co.,* 935 F.2d 1114, 1120 (10th Cir.) (applying Kansas law), *cert. denied,* 502 U.S. 1020, 112 S.Ct. 670, 116 L.Ed.2d 761 (1991); *Simon v. National Farmers Organization, Inc.,* 250 Kan. 676, 680, 829 P.2d 884, 888 (1992). "To be ambiguous, the contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from the natural and reasonable interpretation of its language. An ambiguity does not appear until application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning." *All West Pet Supply Co. v. Hill's Pet Products Div., Colgate–Palmolive Co.,* 840 F.Supp. 1433, 1439 (D.Kan.1993), *modified,* 842 F.Supp. 1376 (D.Kan.1994); *Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co.,* 248 Kan. 657, 659, 810 P.2d 283, 285–86 (1991); *see Hart v. Sprint Communications Co.,* 872 F.Supp. 848, 854 (D.Kan.1994).

5. The loan documents established a revolving line of credit with a $9,500,000 ceiling. There is no evidence in the record that the amount of credit extended to WHJV ever dipped below $9,500,000 after July of 1993. WHJV apparently did make some payments between July of 1993 and May of 1994 but the court cannot determine if they were payments of principal or interest.

■ The court concludes that the loan agreement provisions are unambiguous. Section 2.02 states that advances under the loan shall not total more than $9,500,000 "in any event." Adopting WHJV's interpretation of the last paragraph of section 2.03 would ignore the express language in 2.02. When construing a contract, its "meaning should be ascertained by examining the documents from all corners and by considering all of the pertinent provisions, rather than by critical analysis of a single or isolated provision." *D.R. Lauck Oil Co. v. Breitenbach*, 20 Kan.App.2d 877, 878, 893 P.2d 286, 288 (1995). When considering the pertinent provisions together, the court finds that the loan agreement unambiguously requires Holdings to advance money for interest payments until the loan limit is reached or until certain other events occur that are not presently relevant.

"When a contract is not ambiguous, the court may not make another contract for the parties. Its function is to enforce the contract as made." *Id.* at 878, 893 P.2d at 289 (citing *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 713, 732 P.2d 741 (1987)). Thus, absent other considerations, WHJV's failure to make interest payments after the loan limit was reached constituted default.[6]

WHJV does not dispute that the note became due on April 1, 1995. Note at 1. WHJV also has been deemed to admit that it has made no payments on the note since May 5, 1994. Thus, absent other considerations, WHJV's failure to pay the note when it became due also constituted default.

WHJV contends, however, that other considerations exist. The court agrees. WHJV asserts that Holdings caused any failure to pay by WHJV by breaching its obligations under the joint venture agreement and loan documents as well as by breaching its fiduciary duty. Holdings replies that WHJV has failed to cite any authority for the proposition that default cannot be found to have occurred because of inequitable conduct.

Under the joint venture agreement, Holdings assumed certain obligations. For example, section 5.4 provides that Holdings has the duty to "assist in the development of the Property by making major approvals and funds available promptly." One area in which the parties contemplated Holdings making major approvals was in the development of the golf course. Section 2.15 of the loan agreement reads, in pertinent part, as follows:

> *Approvals and Releases Relating to Golf Course Development.* The parties acknowledge that it is mutually contemplated that a golf course will be developed as part of or in connection with the Project. The location, design, developer, owner, operator or manager and financing for such golf course and the form and content of all agreements pertaining to the design, development, construction, financing, ownership, operation and management of such golf course shall be subject to [Holdings's] approval in its sole and absolute discretion.

(emphasis in original).

The record includes evidence, in the form of an affidavit, that the timely development of the golf course was an integral part of the development and to the generation of sufficient lot sales and cash flow. Mr. Walter

---

**6.** The note, which requires monthly payments of interest and final payment of principal, states "[e]ach of the following events shall constitute an 'Event of Default' hereunder: (a) if default is made in the payment of any installment hereunder, under the terms of any Loan Document, or under the terms of any other obligation of Maker to Lender, when the same is due." Similarly, the mortgage reads "[t]he term 'Event of Default', as used in this Mortgage, shall mean the occurrence of any of the following events: (A) If any payment of principal, interest or any other sum due under the Note, ... is not paid when due...." Under the loan agreement, "[e]ach of the following occurrences shall constitute an 'Event of Default' under this Agreement and each other Loan Document: (A) Any failure by Borrower to pay any installment or other payment or any other sum included in the Obligations when due." Finally, the assignment agreement states "[t]he occurrence of any of the following events shall constitute and is hereby defined to be an 'Event of Default' under this Assignment and shall constitute a default and/or an Event of Default under each other Loan Document: (b) The occurrence and continuance of an Event of Default under any other Loan Document or any failure of Assignor or any other liable person to observe and perform all of the terms, provisions, covenants and agreements under any other Loan Document."

Rist, the affiant, declares that after WHJV bought out the prior golf course developer in early 1993, Holdings promised to pay the golf course contractor for services rendered up to that time. According to Mr. Rist, Holdings failed to make such payment and, as a result, a lien was filed against the property, which caused substantially all development work on the project to cease. Holdings also, continues Mr. Rist, failed to take any action to assist in hiring a new golf course developer and ignored alternative golf course financing plans proposed by OCV. Mr. Rist maintains that Holdings's inaction prevented WHJV from meeting its cash flow projections and caused its cessation of payments.

 Section 2.15 of the loan agreement declares that Holdings's power of approval is exercisable at "its sole and absolute discretion." Nevertheless, this plain language must be read in conjunction with the "good faith and fair dealing" term, which, under Kansas law, is an implied term of every contract except employment at will contracts. *Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 175, 872 P.2d 252, 260 (1994). Fundamentally, this good faith and fair dealing includes the duty to refrain from hindering or preventing the occurrence of another party's duty. E. Allan Farnsworth, Contracts § 7.17 (2d ed. 1990); *see In re Estate of Moe*, 240 Kan. 242, 245, 729 P.2d 447, 449 (1986). A sufficiently material, uncured breach of the good faith and fair dealing term will suspend and then terminate the nonbreaching party's performance. Farnsworth, *supra*, § 8.15; *see In re Estate of Moe*, 240 Kan. at 245, 729 P.2d at 449.

 The court concludes that Mr. Rist's affidavit raises the inference that Holdings's inaction was designed to and did prevent WHJV from performing its loan payment obligations. As a result, material questions of fact exist regarding whether or not WHJV was obligated to continue making payments. These circumstances render summary judgment inappropriate.

 Moreover, in addition to the obligations arising directly from the terms of the joint venture agreement, Holdings and OCV were in a fiduciary relationship as a result of the agreement, *Goben v. Barry*, 234 Kan. 721, 728, 676 P.2d 90, 97 (1984) (citing *Martin v. Hunter*, 179 Kan. 578, 297 P.2d 153 (1956)). Holdings does not dispute that it owes OCV a fiduciary duty nor has Holdings disagreed with WHJV's apparent contention that Holdings's fiduciary duty extends to the joint venture. As a fiduciary, Holdings has "the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A [fiduciary] is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Martin*, 179 Kan. at 585, 297 P.2d at 158 (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928) (Cardozo, J.)). When viewed in the light most favorable to WHJV and OCV, Mr. Rist's affidavit raises the inference that Holdings breached its fiduciary duty. If Holdings acted, or refused to act, with the purpose of driving WHJV into default, perhaps to obtain sole ownership of the real estate in the process, which inferences are drawable on this summary judgment record, then Holdings did not perform its obligations in accordance with the standard enunciated in *Martin*, *i.e.*, Holdings breached its fiduciary duty.

 As Holdings points out, the Kansas Supreme Court has not addressed whether a breach of fiduciary duty causing a cessation of payments on a loan will bar the conclusion that default has occurred. The court concludes, however, that the Kansas Supreme Court would indeed so find under the circumstances. Such a finding is analogous to the "good faith and fair dealing" analysis discussed above. Moreover, the Kansas Supreme Court has explicitly stated that "a litigant may be denied relief by a court of equity on the ground that his conduct has been inequitable, unfair and dishonest, or fraudulent and deceitful as to the controversy in issue. Equity will not permit a litigant to rely on his own wrongful conduct to recover." *Goben*, 234 Kan. at 727, 676 P.2d at 97 (citation omitted). This court is convinced that a breach of fiduciary duty would be viewed by the Kansas Supreme Court as inequitable conduct which could be set up as a defense here.

The existence of the fiduciary duty and the inference that it has been breached stem from the specific circumstances of this case. The fiduciary duty arises from Holdings's status as a partner/joint venturer. At the very same time, Holdings is also a lender dealing with the very entity it partially comprises, possessing potentially conflicting interests in its dual roles. Simply put, this court believes that under the particular factual setting of this action questions of material fact remain which preclude summary judgment.[7]

### C. Severance

 Holdings, citing Federal Rule of Civil Procedure 21, seeks severance of counts VI and VII from the remainder of the suit. When determining whether severance is appropriate under Rule 21, the court considers the convenience of the parties, avoiding prejudice, promoting expedition and economy, *Sutton Hill Assoc. v. Landes*, No. 87 Civ. 8452, 1988 WL 56710, at *2 (S.D.N.Y. May 25, 1988), and the separability of law and logic, *Spencer White & Prentis Inc. v. Pfizer Inc.*, 498 F.2d 358, 362 (2d Cir.1974).

 The court concludes that severance is inappropriate under the circumstances of this case. Most significantly, counts VI and VII involve issues that are inextricably intertwined with the remainder of the action. For example, whether a default has occurred and whether Holdings has breached its fiduciary duty are questions at the center of this dispute. Under these circumstances, the court declines to sever counts VI and VII.

### IV. Order

**IT IS THEREFORE BY THE COURT ORDERED** that Holdings's motion for partial summary judgment on counts VI and VII of its cross claims and for severance thereof (Doc. # 153) is denied.

**IT IS SO ORDERED.**

---

**7.** Holdings has asserted that WHJV has waived any defenses to foreclosure including breach of fiduciary duty. Even if Holdings were correct, a matter which the court does not decide, breach of fiduciary duty remains relevant to the threshold question: has a default occurred.